UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

F.W. WEBB COMPANY, et al.,

                Plaintiffs,

    -against-

STATE STREET BANK AND TRUST
COMPANY, et al.,

                Defendants.

09 Civ. 1241 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

     As the tremors of what became the Great Recession coursed through the real estate market in the years and months before the crisis broke in late 2007, the Yield Plus Fund ("YPF") held fast to a strategy of investing in securities backed by mortgage loans. This was like camping on the beach while an earthquake shakes the ocean floor. Eventually the tidal wave came in, and now there is litigation over the losses. It is banal to observe that those who managed the YPF are not liable to investors simply because the mortgage bets turned bad. Plaintiffs, a 401(k) plan and its named fiduciaries, have a more nuanced theory: they allege that defendants, ERISA service providers closely related to the entity that managed the YPF, misrepresented the YPF's mortgage-heavy investment strategy to plaintiffs in violation of fiduciary duties arising under the Employee Retirement Income Security Act (ERISA).[1] The central question on this

---

[1] Other YPF investors have brought claims against the fund's managers under the Securities Act of 1933, alleging that the publicly-filed prospectuses contained false and misleading statements. *See Yu v. State*

motion to dismiss is whether plaintiffs have adequately alleged that defendants, who provided mainly ministerial and administrative services to the 401(k) plan, in fact owed any such fiduciary duties under ERISA.

## BACKGROUND

(i.) Parties

The F.W. Webb Company is a plumbing and heating distributor based in Bedford, Massachusetts.  It is plaintiff in this action, together with the F.W. Webb 401(k) Plan (the "Plan"), the F.W. Webb Savings & Profit Sharing Plan Committee (the "Plan Committee"), and individual Plan Committee members.  (Compl. ¶ 7.)  The Plan offers its beneficiaries, F.W. Webb employees, a menu of investment options, or "investment menu," from which the beneficiaries select their desired investments.  (*Id*. at ¶¶ 30, 37.)

Defendants are three entities—two subsidiaries of State Street Corporation and one company that spun off from State Street Corporation in 2000—that provided services to the Plan.  The State Street entities are State Street Bank and Trust Company ("SSBT"), a trust company, and State Street Global Advisors ("SSgA"), an investment management company.  SSBT served as the Plan's directed trustee between 1996 and 2008.  In this role, SSBT maintained custody over the Plan's assets and executed investment instructions from the Plan Committee.  A Master Trust Agreement governed SSBT's service relationship with plaintiffs.  (*Id*. at ¶¶ 72-73; Skinner Decl. Ex. I (Trust Agreement).)  In addition, SSBT also provided recordkeeping and administrative services to the Plan from 1996 through April 2000, as set forth in an Administrative Services Agreement ("ASA") between it and F.W. Webb.  (Prussia Aff. Ex. A (ASA) at 5-7.)

---

*Street*, 686 F. Supp. 2d 369 (S.D.N.Y. 2010).  The Court described the YPF's collapse more fully in *Yu*.  *Id*. at 371-72.

SSgA assisted in the provision of these services, which included plan drafting, report preparation, and other ministerial tasks.[2]  (*Id.*)

Aside from listing the administrative services State Street agreed to provide, the ASA also imposed an important obligation on plaintiffs: it required them to "select the investment options to be offered under the Plan from among those made available by State Street."  (*Id.* at 2.)  In other words, plaintiffs could only place a fund on the Plan's investment menu if State Street made that fund available to them.  The Complaint does not explain how State Street decided which investment options to "make available," but the parties have presumed in their arguments to the Court that the set of options State Street made available to plaintiffs was generic—rather than selecting options specifically for the F.W. Webb plan, State Street offered plaintiffs the same set of options it offers to all of its clients—and consisted simply of every State Street-managed fund and every fund that shared fees with State Street.  *See infra* at 10-11.

The third defendant is CitiStreet LLC, a retirement plan service provider formed as a joint venture between State Street Corporation and CitiGroup in April 2000.  (Compl. ¶ 38.)  Soon after its formation, CitiStreet replaced State Street as recordkeeper and administrative provider under the ASA, though the contract itself was never amended to reflect the change.  (*Id.* at ¶¶ 38-39; 56-58.)  State Street did not provide any administrative services after CitiStreet assumed these duties in April 2000, but State Street did continue to serve as directed trustee under the Trust Agreement until 2008.

---

[2] The Complaint does not clearly delineate which State Street entity performed which tasks listed in the ASA.  Rather, most of the allegations lump the two entities together.  The Court therefore refers to them collectively as "State Street" or "the State Street entities," unless there is a need to distinguish.

(ii.)  Dealings between the parties

The State Street entities' relationship with plaintiffs began in 1996, when plaintiffs decided to move the Plan's assets to SSBT from their previous ERISA provider. (*Id*. at ¶ 15.)  Neither service contract between the parties—the ASA or the Trust Agreement—anticipated that State Street would provide plaintiffs with investment advice, but the Complaint alleges nonetheless that all three defendants—first the State Street entities, and then CitiStreet after it assumed State Street's administrative duties in 2000—counseled plaintiffs about which of the available funds to include on the Plan's investment menu.  (*Id*. at ¶ 34.)  Defendants' representatives met with plaintiffs periodically—once or twice a year normally—"to discuss the performance of the [] Plan's various investments, to recommend new funds for F.W. Webb's consideration, and to address any relevant changes in the industry that might affect the [] Plan."  (*Id*. at ¶ 40.)  Defendants provided plaintiffs with literature, such as fact sheets and fund profiles, describing the available investment options, including the YPF.  (*Id*. at ¶¶ 26-27, 50, Ex. A, Ex. E.)   And defendants also performed data analytics for the Plan, producing reports showing the percentage of plan assets invested in particular categories of funds and comparing the Plan's diversification to that of other retirement plans.  (*Id*. at Ex. C, Ex. D.)

Some of the investment advice defendants allegedly gave to plaintiffs concerned the YPF.  In 1996, soon after the parties' relationship began, State Street representatives touted the YPF as a safe but also profitable investment: "[State Street] representatives repeatedly stated to Plaintiffs that the Yield Plus Fund was as stable as a money market fund but would provide better returns."  (*Id*. at ¶ 23.)  State Street representatives also

4

told plaintiffs they would "be 'crazy' not to select the Yield Plus Fund as an investment
option for the [] Plan because of the slightly higher returns [as compared to a money
market fund]." (*Id*. at ¶ 25.)  Accordingly, plaintiffs believed the YPF was a truly
excellent investment—tantamount to a money market fund in risk, but offering higher
returns—and they decided to include it as an option on the Plan's investment menu. (*Id*.
at ¶ 29.)  The YPF remained on the menu for 12 years, where it became the Plan's most
popular investment option.  By April 2007, more participants invested in the YPF than
any other fund on the menu, and many participants chose to invest in the YPF
exclusively. (*Id*. at ¶ 52.)  For many years, this proved a successful investment strategy:
until mid-2007, the YPF performed well, earning plan participants the type of
"satisfactory" returns that encourage more and more investment. (*Id*. at ¶¶ 40, 52.)  But
in the third quarter of 2007, as the real estate sector nosedived, the YPF's run of good
returns ended abruptly.  The fund lost 13.34% of its value in 2007, causing approximately
$2.7 million in losses to plan participants. (*Id*. at ¶¶ 69-70.)  The YPF was liquidated in
May 2008. *See Yu*, 686 F. Supp. 2d at 372.

      Plaintiffs' core allegation is that defendants misled them, mainly by omission,
about the risks of investing in the YPF.  Plaintiffs do not quibble with the accuracy of
State Street's description of the YPF in 1996 (when they described it as a money market
fund that achieved higher returns). (*See* 4/26/10 Argument Tr. at 35:14-21.)  Rather,
plaintiffs allege that the YPF's investment strategy changed dramatically in 2000 or
2001, when the fund abandoned its conservative, low risk-strategy and began speculating
in "high-risk, low-quality mortgage-backed investments," and that defendants never
informed them of this new strategy and the heightened risks it entailed. (Compl. ¶¶ 47-

48.)  Moreover, plaintiffs allege that CitiStreet actively misled them about those risks on at least one occasion.  In 2006, after the YPF had shifted to its high-risk strategy, CitiStreet provided plaintiffs with a thick booklet containing an analysis of the Plan's investments.  The analysis indicated that the Plan's investment menu contained a money market option and that 13% of the Plan's assets were invested in a "Stable Value/Money Market"-type fund.  (*Id*. at ¶¶ 42-43, Ex. C, Ex. D.)   Because no other option on the investment menu resembled a money market fund, plaintiffs contend that these statements referred to the YPF and, by extension, affirmatively misrepresented the YPF as having the attributes of a money market fund.  (*Id*. at ¶¶ 41-43.) [3]

Plaintiffs' claim contains a factual weakness that appears in the record even at this early stage in the litigation: State Street and CitiStreet expressly distinguished the YPF from a money market fund in various documents that were either given to or made available to plaintiffs.  Beginning in 1999, the YPF's public prospectus stated "unlike a money market fund, the price of the Yield Plus Fund will fluctuate because of the fund may invest [sic] in securities with higher levels of risk and different maturities."  (Prussia Aff. Ex. C at 3.)  The same or similar language appeared in every subsequent prospectus. Moreover, a fact sheet included in the booklet CitiStreet prepared for plaintiffs in 2006— the same booklet that contained the allegedly misleading comparisons between the YPF and a stable value/money market fund—made a similar statement: "Unlike a money market fund, the price of the Yield Plus Fund will fluctuate because the Fund may invest

---

[3] In contrast, the State Street entities, which stopped providing administrative services and investment advice in April 2000, are not alleged to have made any statements about the YPF to plaintiffs after the alleged strategy change occurred.

in securities with higher levels of risk and different maturities."  (*Id*. at Ex. D.)[4]

Plaintiffs argue that these disclosures, which they claim not to have read, did not remedy

defendants' misleading statements and omissions.  Because defendants were their

fiduciaries—because plaintiffs relied on defendants to recommend investment options in

face to face meetings—plaintiffs contend defendants had a duty to explain the YPF's

changed strategy to them directly, rather than relying on written statements buried in

public prospectuses and thick booklets.

　　　　The Complaint states claims for breach of fiduciary duty under ERISA and

various causes of action under Massachusetts law, including fraud, negligent

misrepresentation, and violation of the Massachusetts Uniform Securities Act.

## LEGAL STANDARD

　　　　To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough

facts to state a claim to relief that is plausible on its face."  *Starr v. Sony BMG Music

Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (*quoting Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct.

1937, 1949 (2009).  If the factual averments permit no reasonable inference stronger than

the "mere possibility of misconduct," the complaint should be dismissed.  *Starr*, 592 F.3d

at 321 (*quoting Iqbal*, 129 S. Ct. at 1950).  In applying this standard of facial plausibility,

the Court accepts all factual allegations as true and draws all reasonable inferences in

---

[4] Both the booklet and the fact sheet are described in the Complaint and are therefore properly part of the record on this motion to dismiss.  *In re IAC/InterActiveCorp*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007); Compl. ¶¶ 42-44.

plaintiffs' favor, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949. On a motion to dismiss, the Court may properly consider documents referenced in or integral to the complaint, as well as public filings with the Securities and Exchange Commission ("SEC"). *In re IAC/Interactivecorp*, 478 F. Supp. 2d at 585.

## DISCUSSION

I.     ERISA Fiduciary Status

ERISA aims to protect employee pension and retirement plans by establishing "certain general fiduciary duties applicable to the management of [such] plans." *Harris Trust and Savings Bank*, 302 F.3d 18, 26 (2d Cir. 2002) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)). The threshold issue in this case, like in any ERISA case, is whether and to what extent defendants were fiduciaries under the statute. Unless defendants' alleged misrepresentations and nondisclosures about the YPF fell within the scope of fiduciary responsibilities that they owed to the Plan, plaintiffs have no claim under ERISA. *See id.* at 28; *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("[T]he threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.").

"Congress intended ERISA's definition of fiduciary to be broadly construed." *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (quotations omitted). The statute provides for two types of fiduciaries: (1) "named fiduciaries," or entities that are named as fiduciaries in the plan documents; and (2) "functional fiduciaries," or entities that are fiduciaries by virtue of the services they perform for the plan. *In re Lehman Bros.*, 683 F. Supp. 2d 294, 298-99 (S.D.N.Y. 2010). Plaintiffs do not allege that defendants were

named fiduciaries; to the contrary, it is undisputed that the Plan's only named fiduciaries were plaintiffs themselves (the Plan Committee, its members, and the Company). The question is whether defendants acquired functional fiduciary status through the services they provided to the Plan.

> ERSIA identifies three separate bases for functional fiduciary status:
>
> [A] person is a [functional] fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002 21(A) (2008). Plaintiffs argue that defendants fall within both the first and second grounds. First, they contend that defendants exercised "authority or control" over Plan assets by setting the universe of investment options available to the Plan for inclusion on its investment menu. Secondly, they contend that defendants rendered investment advice to the Plan for a fee. The Court considers each assertion in turn.

A. "Authority or control respecting management or disposition of plan assets"

Subsection (i) of the provision contains two separate bases for fiduciary status: persons fall within it if they exercise either "discretionary authority or discretionary control" over plan management *or* "any authority or control" over disposition of plan assets. 29 U.S.C. § 1002 21(A)(i); *Chao v. Day*, 436 F.3d 234, 236-37 (D.C. Cir. 2006). Contrary to occasional statements in the case law that "discretion is the *sine qua non*" of ERISA fiduciary status, the second prong of this subsection plainly does not require that a person exercise discretion over the disposition of plan assets. *Chao*, 436 F.3d at 236; *see also LoPresti*, 126 F.3d at 40; *IT Corp. v. General American Life Ins. Co.*, 107 F.3d

1415, 1421 (9th Cir. 1997).  So long as a person possesses "authority or control" over plan assets, he is a fiduciary, even if he simply handles the assets according to instructions that others give him.  *Chao*, 436 F.3d at 236 (insurance broker who disposed of plan assets according to "strict instructions" was a fiduciary, despite lack of discretion).

Here, the ASA required plaintiffs to select the components of the investment menu from "among those [investment options] made available by State Street."  (Compl. ¶¶ 33, 77.)  In other words, there were two menus: a "big menu" of potential investment options that State Street provided to plaintiffs; and a "small menu" of funds (the investment menu) that plaintiffs drew from the big menu and made available to plan participants.  Plaintiffs contend that defendants exercised "discretionary authority or control" over plan assets by setting the big menu.

The complaint leaves some gaps in the story.  First, there is no solid information about the size of each menu.  The papers give the Court a vague sense that plaintiffs drew a small menu of about five or six of funds from a big menu of about 16 options, (*see id.* at ¶ 30), though the pleadings do not fix those numbers with certainty.   The precise numbers probably would not be dispositive of the fiduciary status issue, though to some extent the degree of "control" that defendants exercised over the plan will be inversely proportional to the difference between the two menus' sizes (for example, if plaintiffs selected a small menu of 5 funds from a big menu of 7, that arrangement evinces more control by defendants than a small menu of 5 drawn from a big menu of 20).  Second, and more importantly, the complaint does not indicate how defendants selected the big menu. The parties' papers and statements at oral argument create the impression that the big

menu consisted of every fund to which defendants had some level of institutional

connection.  (4/26/10 Argument Tr. at 29:24 – 30:4 ("At one point F.W. Webb said let's

do some Fidelity funds.  [Defendants] said no, you can't do it.  Why?  Because

[defendants] could only pick people whom they had relationships with and presumably

were compensated by for recommending their funds and Fidelity wasn't one of them . . .

.") (statement of plaintiffs' counsel); *id*. at 15:4-9 ("[CitiStreet makes available] all of the

funds that it has a relationship with in the sense that it can administer them") (statement

of CitiStreet counsel); Pl. Mem. at 17 n.5 ("Defendants apparently recommended only

fund families with which they had fee-sharing relationships.").)  This type of

arrangement appears to be standard in the industry.  *See Hecker v. Deere & Co.*, 556 F.3d

575, 583 (7th Cir. 2009) ("Fidelity . . . limit[ed] Deere's selection of funds through the

Trust Agreement to those managed by Fidelity Research.").  Thus, it seems that the "big

menu" simply contained a generic list of every fund that defendants made available to

their many clients—all the goods in the store, so to speak—rather than a list of

investment options specifically tailored to plaintiffs' needs and goals.

In *Hecker*, the Seventh Circuit examined the fiduciary implications of a similar

two-menu arrangement.  There, the court held that an administrative service provider did

not become a fiduciary simply because the service contract required the plan sponsor to

select the plan's investment menu from the limited spectrum of funds offered by the

service provider's sister company.  *Id*. at 583.  In affirming dismissal of the complaint,

the court reasoned that a person only exercises "authority or control" over plan assets if

that person has "final say" over the list of options that will be made available to plan

participants; simply influencing those determinations by limiting the universe of

possibilities according to some objective criteria—like funds associated with a particular

corporation—does not confer fiduciary status.  *Id*.  The court drew a distinction between

service providers who "play a role" in the composition of the investment menu and those

who have "final authority" over its contents.  Only the latter are fiduciaries:

> Many people help develop and manage benefit plans—lawyers and
> accountants, to name two groups—but despite the influence of these
> professionals we do not consider them to be Plan fiduciaries. . . . There is
> an important difference between an assertion that a firm exercised "final
> authority" over the choice of funds, on the one hand, and an assertion that
> a firm simply "played a role" in the process, on the other hand.

*Id*. at 584.[5]

This Court finds *Hecker* persuasive.  Like the defendants in that case, defendants'

role here in establishing the "big menu" bears too tenuous a connection to the eventual

disposition of plan assets to constitute "authority or control" within the meaning of the

statute.  Indeed, two layers of decision-making separated defendants from the final

decisions about how plan assets would be invested: the plan committee's selection of the

"small menu;" and the individual plan participants' selection of an investment option or

options from the small menu.  This degree of separation between defendants and the

actual disposition of plan assets stands in stark contrast to the typical "authority or

control" case, in which fiduciary status arises from a person's custody over plan assets,

*Chao*, 436 F.3d at 236-37, or from a person's power to make direct determinations—

unimpeded by intermediaries—as to how plan assets will be allocated.  *LoPresti*, 126

F.3d at 40.  Defendants' role in setting the big menu has more in common with the work

of non-fiduciary professionals who influence, or "play a role in," disposition of plan

---

[5] An earlier Seventh Circuit decision, cited in *Hecker*, made a similar point: "Those cases which hold that
the person or firm was a fiduciary have a common theme . . . *viz.*, the authority to exercise control
unilaterally over a portion of a plan's assets . . . ." *Farm King Supply v. Edward D. Jones & Co.*, 884 F.2d
288, 292 (7th Cir. 1989).

assets, than with the duties of those decision-makers who have been found to exercise the requisite authority or control.  *See Hecker*, 556 F.3d at 583.

Plaintiffs rely on three district court cases—two from within this circuit—for the proposition that limiting the universe of funds available to a plan for inclusion on its investment menu is a fiduciary function.  *See Phones Plus, Inc. v. Hartford Fin. Servs. Group, Inc.*, No. 06 Civ. 1835, 2007 WL 3124733, at *4 (D. Conn. Oct. 23, 2007); *Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156, 165-67 (D. Conn. 2006); *Charters v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168, 171-72 (D. Mass. 2007). Two of these cases, however, make no mention of a two-menu system, and the defendants appear to have had direct authority to alter the list of funds presented to Plan participants.  *Haddock*, 419 F. Supp. 2d at 166 n.6; *Charters*, 534 F. Supp. 2d at 172. Only plaintiffs' third citation, *Phones Plus*, is clearly on point.  The alleged fiduciary in that case, like the defendants in here, had authority over the big menu but not the small menu:

> Hartford [the defendant] provides the Plan with a menu of investment options, including certain mutual funds.  From this menu, the Plan selects a subset of investment options to offer to the Plan's participants . . . . Hartford has the authority to change the menu of funds it makes available to the Plan by adding or removing mutual funds to or from the menu.

2007 WL 3124733 at *1.  The district court held that on these facts a jury could find that Hartford was a fiduciary under ERISA.  *Id*. at *4.  Respectfully, this Court does not find *Phones Plus* persuasive.  Though the decision spends much time distinguishing authority indicating that this type of two-menu arrangement does *not* create fiduciary responsibility, it does not cite any authority affirmatively supporting the conclusion that Hartford exercised the requisite "authority or control" through its control over the big menu.  *See id*.  The Seventh Circuit, in this Court's opinion, offers the better analysis.

13

With additional allegations, plaintiffs might make out a claim of functional fiduciary status under the first prong of subsection (i) of the functional fiduciary provision—namely, that defendants exercised "discretionary authority or discretionary control respecting management" of the plan by selecting the big menu.  29 U.S.C. § 1002 21(A).  If defendants chose investment options for the plan based on individualized criteria—by making judgments about which options best suited the plan—they may well have exercised "discretion" within the meaning of the statute.  But plaintiffs have not made any allegations to support this theory.  Rather, the complaint simply states that the ASA obligated plaintiffs to "select the investment options to be offered under the F.W. Webb 401(k) Plan from among those made available by [defendants]."  (Compl. ¶ 77.)  As for how defendants chose those funds, the Complaint provides no information (despite the likelihood that plaintiffs, through their 12-year relationship with defendants, gained some concept of the criteria by which funds were "made available" to them), though every indication is that defendants made investment options available according to objective criteria, such as whether they had an institutional relationship with a particular fund.  As the Seventh Circuit has held, this type of arrangement evinces neither control no discretion under the statute.  *See Hecker*, 556 F.3d at 583.

B.    "Investment advice for a fee or other compensation"

Plaintiffs also contend defendants are fiduciaries because they advised plaintiffs about which available investment options to include on the small menu.

The Department of Labor has issued a regulation clarifying the circumstances in which a service provider renders "investment advice for a fee" within the meaning of the functional fiduciary provision:

(c) *Investment advice.*  (1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of [the function fiduciary provision] only if:

(i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) Such person either directly or indirectly (e.g., through or together with any affiliate)--
….

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21 (2010).  Thus, to plead that a defendant is a fiduciary because it provided "investment advice for a fee," a plaintiff must plead that (1) the defendant provided individualized investment advice; (2) on a regular basis; (3) pursuant to a mutual agreement, arrangement, or understanding that (4) the advice would serve as a primary basis for the plan's investment decisions; and (5) the advice was rendered for a fee.  *See, e.g., Thomas, Head & Greisen Employees Trust v. Buster*, 24 F.3d 1114, 1117 (9th Cir. 1994); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 708 (W.D. Mich. 2007).  Courts have recognized that the regulation, and in particular the "mutual agreement" requirement, seeks to separate compensated investment advice—which properly gives rise to fiduciary status—from mere sales efforts touting the attributes of a security or investment vehicle.  *See Ellis*, 484 F. Supp. 2d at 709 n.2 ("[T]he writers of the regulation were attempting to differentiate individualized investment advice, which is based upon the particular needs of the plan, from the general promotion of a product or

service, pursuant to which a stockbroker might 'recommend' a security to its customers at large."); *Farm King*, 884 F.2d at 294. Urging a plan fiduciary to purchase one financial product or another does not qualify as "investment advice" unless the parties have come to a "mutual agreement, arrangement or understanding" that the provider will offer advice as a remunerated service and that the plan will rely on the advice as a primary basis for its investment decisions. *Id.*

Here, plaintiffs allege defendants provided investment advice throughout the parties' 12-year relationship. Many of the relevant averments are conclusory and simply parrot the language of the regulation. (*See* Compl. ¶ 34 ("State Street Bank regularly provided investment advice upon which the F.W. Webb 401(k) Plan relied . . . . The investment advice . . . was provided pursuant to a mutual understanding . . .); *Id.* at ¶¶ 34-40.) There is, however, one concrete example of an occasion on which defendants recommended that plaintiffs include a particular fund on the small menu. At a 1996 meeting, State Street representatives told plaintiffs they would be "crazy" not to select the YPF as an investment option, given that its returns were higher than a money market fund. (*Id.* at ¶ 25.) Beyond this specific example of an actual recommendation, other allegations suggest that plaintiffs relied on defendants as their primary source for information (if not concrete recommendations) about the different investment options. Specifically, the Complaint alleges that (1) the parties met periodically—once or twice a year on average—to discuss the plan, its investments, and its performance; (2) defendants routinely advised plaintiffs about the characteristics of the available State Street funds, and plaintiffs often based their investment decisions on this information; (3) defendants reported on the Plan's diversification, breaking the investments into categories according

to defendants' own descriptions of the various funds (for example, defendants classified investments in the YPF as "Stable Value/Money Market" investments); and (4) plaintiffs did not receive investment advice from other sources.  (*Id*. at ¶¶ 36-37, 40-44, 50-53; Ex. D.)  Plaintiffs argue the Court should infer the existence of an investment advice relationship, including the requisite "mutual agreement, arrangement, or understanding," from these allegations about their course of dealings with defendants.

Defendants argue that the ASA—the contract covering the parties' administrative services relationship—renders plaintiffs' investment advice claim implausible, because the ASA does not contemplate the provision of investment advice.  Exhibit A to the agreement lists all of the services that State Street (later replaced by CitiStreet as administrative service provider) agreed to provide to F.W. Webb.  The list includes the spectrum of ministerial tasks that an ERISA administrative provider typically performs: plan drafting; provision of documents and forms; preparation of reports and disclosures; and testing for compliance with the Internal Revenue Code.  (Prussia Aff. Ex. A at 5-7.) Investment advice is not on the list.

Where ERISA plan fiduciaries and a service provider enter into a written contract, that contract logically serves as the starting point and primary reference for any analysis of whether the service provider performed duties that give rise to fiduciary responsibilities under ERISA.  *See Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 19 (1st Cir. 1998).  In *Beddall*, the First Circuit relied primarily upon the language of a trust agreement to hold, on a motion to dismiss, that SSBT was not a fiduciary to the Eastern Airlines retirement plan.  The plan had incurred losses after its investment manager—not related in any way to SSBT—assigned inflated values to a portfolio of real

estate investments.  SSBT was alleged to have violated fiduciary duties by accepting the investment manager's valuations without adequate investigation or analysis.  The trust agreement undercut this theory of liability: it provided that SSBT, as trustee, had "no responsibility for supervising any Investment Manager" and "no obligation to review or to make inquiries as to any action or direction of any Investment Manger."  *Id*. at 20.  The plaintiffs nonetheless argued that despite this contractual language, SSBT had accepted responsibility for supervising the investment manager through its *conduct*, because SSBT had inquired into the investment manager's valuations on other occasions.  The court rejected this attempt to evade the contractual language:

> As a matter of policy and principle, ERISA does not impose Good Samaritan liability.  A financial institution cannot be deemed to have volunteered itself as a fiduciary simply because it undertakes . . . responsibilities that exceed its official mandate.  Imputing fiduciary status to those who gratuitously assist a plan's administrators is undesirable in a variety of ways, and ERISA's somewhat narrow fiduciary provisions are designed to avoid such incremental costs.  Viewed against this backdrop, a rule that would dampen any incentive on the part of depository institutions voluntarily to make relevant information available to fund administrators and other interested parties is counter-intuitive.  Moreover, such a wrong-headed rule would also risk creating a climate in which depository institutions would routinely increase their fees to account for the risk that fiduciary liability might attach to nonfiduciary work.

*Id*. at 21 (internal citations and quotation marks omitted).

*Beddall's* consequentialist reasoning may go too far: ERISA's functional fiduciary provision forthrightly contemplates that a service provider's conduct will give rise to fiduciary duties, despite the risk that providers will as a result be dissuaded from performing certain useful tasks and functions.  *See* 29 U.S.C. § 1002 21 (A).  And at least in this circuit, ERISA's fiduciary provisions have not been interpreted as "narrow."  *LoPresti*, 126 F.3d at 40 ("Congress intended ERISA's definition of fiduciary to be

broadly construed.").  But *Beddall* is still persuasive, at least to the extent it holds that an ERISA provider does not have a fiduciary obligation to provide a service it specifically contracted not to provide.  If plaintiffs could base claims on such counter-contractual obligations, then it would become effectively impossible for ERISA providers to contract to render merely administrative, non-fiduciary services.  Providers of such limited services would, in turn, necessarily increase their fees to account for the risk that, despite the clarity of their contract, they will be assigned investment advice or other fiduciary liability for purely administrative work.  *See Beddall*, 137 F.3d at 21.  All ERISA constituents—plans, beneficiaries, and service providers—would better benefit from a rule allowing them to contract for the services they actually desire.

This case, however, is more complicated than *Beddall*.  Unlike the trust agreement in that case, the ASA does not expressly excise investment advice from the range of defendants' services.  Rather, the contract is silent on the subject.  Moreover, in requiring plaintiffs to choose funds from a set of options that defendants "made available," the ASA's language contemplates an arrangement between the parties that might logically foster an investment advice relationship.  By necessity, defendants had to provide plaintiffs with a list of available investment options.  The Complaint alleges that when defendants did so, they also advised plaintiffs about the attributes of each option— their investment strategies and levels of risk—and about the diversification of the Plan's portfolio as compared to the average retirement or defined contribution investment plan. (Compl. ¶¶ 24-28, 36-37, 42-45, 50-51, Ex. C, Ex. D.)  To be sure, the ASA did not require defendants to provide plaintiffs with this type of analysis, but the Complaint adequately alleges that they did so anyway, and the contract's language does not

affirmatively undercut the plausibility of those allegations.  At this early stage in the litigation, when all plausible inferences must be drawn in plaintiffs' favor, the allegations that defendants regularly advised plaintiffs about the funds and provided them with analysis of the portfolio are sufficient to plead that defendants rendered investment advice within the meaning of the statute and regulation, particularly since plaintiffs did not receive investment advice from any other source.  *See Buster*, 24 F.3d at 1119; *Ellzey v. Carter*, 920 F. Supp. 26, 29 (D. Conn. 1995) ("In determining whether [a mutual agreement] existed . . ., the court must look to the nature and duration of the relationship [between the parties].").  Discovery will clarify whether defendants in fact gave advice "about the value of securities" or "ma[d]e recommendations as to the advisability of investing in, purchasing, or selling securities" on a regular basis and pursuant to a mutual agreement, arrangement, or understanding.  29 C.F.R. § 2510.3-21(c)(1).

Defendants also argue the Complaint does not adequately allege that they provided investment advice "for a fee."  Though defendants were compensated for the services listed in the ASA and also received commissions when the Plan invested in State Street funds, (Compl. ¶¶ 34, 76, 78-79), they contend the claim fails because the Complaint does not allege that plaintiffs paid them any fees designated specifically for investment advice.  The statute, however, requires only that the investment advisor receive "a fee or other compensation, direct or indirect" in exchange for investment advice; it does not require that the investment advice be compensated directly.  29 U.S.C. § 1002 21(A).  Given this loose statutory language, the allegations that defendants' advice produced commissions and fell within a broader, remunerated service relationship satisfy the "fee" element at the pleading stage.  *See Ellis*, 484 F. Supp. 2d at 710

20

(evidence that broker received "a commission at the time each security was purchased, as well as a number of other fees during the life of the relationship" satisfied fee element); *Buster*, 24 F.3d at 1120 (sales commissions constituted "fee or other compensation" under statute).

Accordingly, the Court holds the Complaint adequately alleges that defendants provided investment advice for a fee under subsection (ii) of the functional fiduciary provision.  29 U.S.C. § 1002 21(A)(ii).


II.    Breach of Fiduciary Duty

The Court now considers the sufficiency of the allegations that defendants breached fiduciary duties with respect to the provision of investment advice.

ERISA requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104 (a)(1)(B).   Courts interpret this language to create both a duty of loyalty and a duty of prudence.  *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547 (6th Cir. 1999); *Morse v. Stanley*, 732 F.2d 1139, 1144-45 (2d Cir. 1984).  Together, the duties of loyalty and prudence impose "an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation."  *Krohn*, 173 F.3d at 547 (internal quotations omitted).  More specifically, a fiduciary violates the duty of loyalty by making materially misleading

representations.  *Id*.; *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir.

1997).

      A.    <u>CitiStreet</u>

      Plaintiffs have stated a plausible claim that CitiStreet breached its fiduciary duties

as de facto investment advisor to the Plan from 2000 to 2008.  The Complaint alleges that

during this time period, CitiStreet affirmatively misrepresented the YPF to plaintiffs as a

safe, conservative investment, tantamount to a money market fund.  (Compl. ¶¶ 41-49.)

In actuality, the YPF was, at least in those years, a highly risky fund that invested mainly

in low-quality mortgage-backed investments.  (*Id*. at ¶¶ 47-48.)  Thus, the Complaint

adequately alleges that CitiStreet breached its duty of loyalty by making affirmative

misrepresentations about the YPF.  *See Krohn*, 173 F.3d at 547.  More generally, the

Complaint states a claim that CitiStreet acted imprudently.  According to the allegations,

CitiStreet understood that the Plan Committee desired to include a money-market type

fund on the investment menu and that the Plan Committee in fact believed the YPF to be

such an investment.  (Compl. ¶¶ 92-100.)  Despite this knowledge, CitiStreet never

informed plaintiffs that they were mistaken—that the YPF was far riskier than a money

market fund—but instead continued to tout the YPF's attributes.  (*Id*.)  These allegations

are sufficient to plead that CitiStreet violated its duty to "act as a prudent person would

act in a similar situation."  *Krohn*, 173 F.3d at 547; *California Ironworkers Field Pension

Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043-44 (9th Cir. 2001).

      CitiStreet argues that the documents expressly distinguishing the YPF from a

money market fund—namely, the publicly-filed prospectuses and the fact sheet included

in the 2006 booklet—undercut the plausibility of plaintiffs' claims.  While these

documents do present a thorny problem for plaintiffs, they do not warrant dismissal of the claims against CitiStreet at this juncture.  The documents stated that "unlike a money market fund," the YPF's price would fluctuate due to investments in "securities with higher levels of risk and different maturities."  (Compl. Ex. D; Prussia Aff. Ex. C at 3.)  Undeniably, this disclosure language blunts the presumptive effect of CitiStreet's alleged misrepresentations that the YPF had the "stability of a money market fund." (Compl. ¶ 41.)  In the securities law context, the Second Circuit has held that misrepresentations in advertising materials are immaterial as matter of law if they are clearly contradicted by language in an offering prospectus.  *Hunt v. Alliance North American Government Income Trust*, 159 F.3d 723, 730 (2d Cir. 1998) (where prospectus clearly distinguished fund from treasury securities, no reasonable investor could be misled by advertising materials comparing mutual fund to investment in treasury securities).  Like in *Hunt*, materiality is a touchstone issue here: plaintiffs have no claim if CitiStreet's misrepresentations were not significant enough, in the face of disclosures elsewhere, to mislead a reasonable person into believing that the YPF had the stability of a money market fund.  *See Estate of Becker*, 120 F.3d at 8 (misrepresentations must be "material" to support ERISA breach of fiduciary duty claim).  Unlike in *Hunt*, however, the misrepresentations here are alleged to have been made in a fiduciary context, not in advertisements.  To hold as a matter of law at the pleading stage that a reasonable investor could not have been misled by a fiduciary's direct misrepresentations about a security because a prospectus contained some disclosure language to the contrary would overextend both *Hunt* and the materiality doctrine.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2000) ("a

23

complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (quotations omitted).

      B.    <u>State Street</u>

The claims against State Street have less merit.  It served as administrative provider and recordkeeper under the ASA from 1996 through 2000, and is also alleged to have provided investment advice during the same time period.  But State Street did not make any misstatements or otherwise breach its fiduciary duties during those years, at least according to the averments.  The Complaint alleges State Street told plaintiffs in 1996 that the YPF had the stability of a money market fund, but plaintiffs do not contend that representation was false at the time.  Rather, only after the YPF switched to its high-risk strategy in 2000 or 2001 did it become false, under plaintiffs' theory, to describe the YPF as a money-market type fund, and by that time CitiStreet had replaced State Street as plaintiffs' administrative service provider and de facto investment advisor.  (Compl. ¶¶ 38-40, 47.)  Neither State Street entity is alleged to have provided plaintiffs with any investment advice, or even any administrative services, after April 2000.  As such, the Complaint does not plausibly allege that State Street breached any fiduciary duties under ERISA.  *See Krohn*, 173 F.3d at 547.

Plaintiffs argue State Street is vicariously liable for CitiStreet's fiduciary breaches because State Street was a party to the ASA.  CitiStreet assumed State Street's duties under the ASA in 2000, but the parties did not amend the contract to reflect this development.  Thus, State Street retained its contractual obligations under the ASA even

after it ceased performing administrative services in 2000, and, plaintiffs argue, State Street is therefore liable for CitiStreet's breaches.  The flaw in this argument is that CitiStreet's fiduciary obligations arose from the course of its relationship with the plaintiffs, not from the text of the ASA.  The ASA itself does not say anything about investment advice.  CitiStreet may have become a fiduciary by virtue of its decision to provide plaintiffs with advice about the State Street funds, if the allegations in the Complaint are true, but the ASA created no duty to provide such advice.  Accordingly, while it is true that an obligor cannot delegate away a contractual duty without the obligee's consent, *see Restatement (Second) of Contracts* § 318(3); *Howe v. Varity Corp.*, 36 F.3d 746, 756 (8th Cir. 1994), this principle does not impute liability to State Street for CitiStreet's breach of a free-standing, non-contractual fiduciary duty.[6]

Finally, plaintiffs argue the Complaint states a claim against State Street for breaching its fiduciary duties as directed trustee.  Though State Street stopped providing alleged investment advice in 2000, it continued serving as the Plan's directed trustee (through its trust company arm, SSBT) until at least 2008.  As directed trustee, State Street maintained custody over Plan assets and implemented the Plan Committee's investment instructions.  Consequently, because it continued to control Plan assets after April 2000, State Street still owed some fiduciary duties to the Plan even after CitiStreet replaced it as the alleged de facto investment advisor.  29 U.S.C. § 1002 21(A)(i); *In re WorldCom*, 354 F. Supp. 2d 423, 444 (S.D.N.Y. 2005) ("While a directed trustee is

---

[6] Plaintiffs also argue briefly that State Street is liable for CitiStreet's breaches under agency principles.  But the Complaint does not allege the existence of a principal-agent relationship between State Street and CitiStreet, which would require that the former controlled the latter in its performance of services for plaintiffs.  *Restatement(Third) of Agency* § 1.01, § 14; *In re Rezulin*, 392 F. Supp. 2d 597, 607 (S.D.N.Y. 2005) (Kaplan, J.) ("Without control, there is no agency relationship.").  Plaintiffs' agency argument is therefore unpersuasive.

deprived of discretion to manage and control plan assets, it has responsibility over ERISA assets and is obliged to follow only those directions of a named fiduciary that are 'proper' and not 'contrary to' ERISA.").  Under ERISA, however, a fiduciary is only liable for conduct that falls within the scope of its fiduciary authority.  *See In re Lehman Brothers*, 683 F. Supp. at 299.  State Street continued to hold the Plan's assets and to execute plaintiffs' investment instructions after April 2000, but it did not by virtue of these limited functions retain fiduciary responsibility for providing accurate investment advice. Rather, State Street's fiduciary duties as directed trustee with regard to the Plan's investment decisions were extremely narrow.  *See WorldCom*, 354 F. Supp. 2d at 444-45 ("Since a person is a fiduciary to a plan only to the extent the person functions as a fiduciary, the fiduciary obligations of directed trustees are circumscribed by the parameters of their duties . . . .").  First, it had a duty of prudence, which required it to inquire into any investment instruction that it knew or should have known was imprudent, contrary to ERISA, or contrary to the terms of the Plan.  *Id*. at 446-47; *Summers v. State Street*, 453 F.3d 404, 407 (7th Cir. 2006).  This duty is quite constricted; typically, a directed trustee is only charged with knowledge that an investment instruction is imprudent where the trustee possesses non-public information that a company's financial statements are false or where it possesses public information showing with near certainty that a company is on the brink of collapse.  *See WorldCom*, 354 F. Supp. 2d at 446-48. Second, under the doctrine of co-fiduciary liability, State Street also had a duty to make reasonable efforts to remedy the breach of another fiduciary if it knew that other fiduciary was breaching duties to the Plan.  *Id.* at 445.

The Complaint does not support a claim that State Street violated either of these narrow duties.  Plaintiffs' position seems to be that State Street should have inquired into the Plan Committee's decision to leave the YPF on the investment menu after the YPF's strategy changed and it became a riskier fund.  But State Street is not alleged to have known anything about the YPF that would have shown the decision to keep the fund on the investment menu to be imprudent.  Though State Street certainly knew the YPF was investing in mortgage-backed securities and was riskier than a money-market fund (two facts disclosed in the prospectuses), no one argues that those facts alone rendered the YPF an imprudent investment under the principles set forth in *WorldCom*.  *Id.* at 446-48.  Plaintiffs also argue that the YPF's continued presence on the menu violated the diversification requirements of ERISA § 404(c).  But as State Street points out, 404(c) is simply a safe harbor provision that limits the liability of fiduciaries in some instances; a person does not "violate" ERISA by straying from 404(c)'s guidelines.  *See In re Morgan Stanley*, 696 F. Supp. 2d 345, 359 (S.D.N.Y. 2009); *DiFelice v. U.S. Airways*, 497 F.3d 410, 418 n.3 (4th Cir. 2007).  Lastly, there is no basis for co-fiduciary liability; the Complaint simply does not allege that State Street knew that CitiStreet or any other fiduciary provided plaintiffs with inaccurate investment information or otherwise breached duties to the Plan

Plaintiffs' real argument seems to be that because State Street continued to serve as directed trustee after April 2000, it also should have continued to provide plaintiffs with updates about their investments and to ensure that plaintiffs' selections for the investment menu still matched their investment goals.  As already noted, however, the duties of an ERISA fiduciary extend only as far as its fiduciary functions,  *see In re*

*Lehman Brothers*, 683 F. Supp. at 299, and State Street is not alleged to have performed investment advice functions after April 2000.  Moreover, the Plan had two actual investment fiduciaries to provide such investment services: (1) the Plan Committee, which had sole responsibility for selecting the investment menu; and (2) CitiStreet, which according to the Complaint advised plaintiffs about the available investment options during and after the time the YPF changed strategies.  Because the Complaint does not allege that State Street knew or should have known that either fiduciary failed to perform its duties to the Plan, or that State Street executed any investment instruction imprudently or in violation of ERISA or the Plan, the Complaint does not allege that State Street breached duties to the Plan as directed trustee.  *See WorldCom*, 354 F. Supp. 2d at 444-46.

*     *     *

For the foregoing reasons, the Court holds that the Complaint adequately alleges a breach of fiduciary duty against CitiStreet but not against State Street.

III.    <u>State Law Claims</u>

Aside from the ERISA claims, the Complaint also states claims under Massachusetts state law for fraud, negligent misrepresentation, negligence, violations of Chapter 93A (consumer protection law), and violations of § 410(a)(2) of the Massachusetts Uniform Securities Act.  Like the ERISA claims, these claims are premised on allegations that defendants misrepresented the YPF to plaintiffs between 1996 and 2008.

A.    Preemption

"ERISA provides that it 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 59 (2d Cir. June 15, 2010) (quoting 29 U.S.C. § 1144(a)).  With one exception discussed below, this express preemption provision clearly reaches plaintiffs' state law claims against State Street and CitiStreet because those claims are based on the same allegations underlying the ERISA claims—namely, that defendants, as ERISA fiduciaries, made misrepresentations while performing services to the Plan.  *See Watson v. Consol. Edison of N.Y.*, 594 F. Supp. 2d 399, 408-09 (S.D.N.Y. 2009) (ERISA preempts fraud and breach of fiduciary duty claims premised on fiduciaries' misconduct in administering ERISA plan).  Plaintiffs do not argue to the contrary.  Rather, they press the state law claims in the alternative and argue only that ERISA would not have preempted the claims had the Court found defendants were *not* fiduciaries under the statute.  (Pl. Opp. Mem. at 31 ("Claims against non-ERISA fiduciaries based on non-ERISA legal duties are not preempted").).  Because the Court has found defendants were fiduciaries, this argument is moot.[7]

---

[7] Because State Street's fiduciary role from April 2000 onwards was limited to its duties as directed trustee, one might argue that any representations it made to plaintiffs about the YPF during that time fell outside the scope of its ERISA functions and are thus the proper subject of state law actions.  *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005) ("[W]here an ERISA plan's relationship with another entity is not governed by ERISA, it is subject to state law.") (quotations omitted).  The Complaint, however, does not allege that State Street made any statements about the YPF to plaintiffs after April 2000, nor does it allege State Street owed plaintiffs any duty of care (apart from its duties as directed trustee) requiring affirmative disclosure of information to plaintiffs after that date.  Thus, even if the fraud, negligent misrepresentation, and negligence claims against State Street are not preempted to the extent they are based on post-April 2000 conduct, those claims warrant dismissal for failure to state a claim.  *See Fordyce v. Town of Hanover*, 457 Mass. 248, 257 (2010) (fraud requires evidence of "a knowing[ly] false representation of a material fact"); *O'Connor v. Merrimack Mut. Fire Ins. Co.*, 897 N.E.2d 593, 602 (Mass. App. Ct. 2008) (negligent misrepresentation requires proof that defendant provided "false information"); *Lev v. Beverly Enterprises-Massachusetts, Inc.*, 457 Mass. 234, 239-240 (Mass. 2010) ("To prevail on a claim of negligence, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care [and] that the defendant breached this duty . . . .") (quotations omitted).

B.    Massachusetts Securities Act Claim

Unlike the other claims, plaintiffs' claim under § 410(a)(2) of the Massachusetts Uniform Securities Act is not preempted because it falls under an exception for state securities laws in the ERISA preemption provision.  29 U.S.C. § 1142(b)(2)(A). Recognizing this exception, defendants move to dismiss this cause of action for failure to state a claim on the merits, rather than on preemption grounds.

A securities purchaser may recover under § 410(a)(2) if "(1) the defendant offers or sells a security; (2) in Massachusetts; (3) by making any untrue statement of a material fact or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or in the exercise of reasonable care [would] have known, of the untruth or omission."  *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 52 (2004) (internal quotations and alterations omitted).

With respect to State Street, the Complaint fails to adequately plead the third element.  As already noted, plaintiffs do not allege State Street made any material misstatements or omissions about the YPF while providing investment advice to the Plan Committee.  The § 410(a)(2) claim against State Street is therefore dismissed.  *See id.*

CitiStreet challenges the allegations supporting the first element of § 410(a)(2), which requires that the defendant "offered or sold a security."  This element encompasses two different types of securities sellers: (1) "direct sellers," who own the securities at issue and pass title to buyers; and (2) "solicitor sellers," who do not actually own the securities but persuade others to purchase them.  *Pinter v. Dahl*, 486 U.S. 622, 642-44 (1988).[8]  The parties agree CitiStreet was not a "direct seller," because it is not alleged to

---

[8] Massachusetts courts interpret § 410(a)(2) in line with federal case law interpreting § 12 of the Securities Act of 1933, because the two provisions are substantially similar.  *Marram*, 442 Mass. at 51.

have passed title to any shares in the YPF.  The disputed issue is whether CitiStreet qualifies as a "solicitor seller."

Solicitor sellers must be "directly involved in the actual solicitation of a securities purchase."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996); *In re Westinghouse*, 90 F.3d 696, 717 n.19 (3d Cir. 1996) ("An allegation of direct and active participation in the solicitation of the immediate sale is necessary for solicitation liability . . . . Such an allegation is crucial so as to ensure a direct relationship between the purchaser and the defendant, without which a defendant is simply not a statutory seller."). "A person's 'remote' involvement in a sales transaction or his mere 'participat [ion] in soliciting the purchase' does not subject him to Section 12 liability."  *Shaw*, 82 F.3d at 1215 (quoting *Pinter*, 486 U.S. at 651 n.27).  Rather, to be a solicitor seller, the defendant must have directly "urged" or sought to "persuade[]" the buyer to purchase the securities. *Pinter*, 486 U.S. at 644, 647; *Smith v. Am. Nat'l Bank and Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992) ("A non-owner cannot be a seller [] unless he urges a prospective purchaser to buy.").

CitiStreet, as an advisor who counseled plaintiffs about the various State Street funds available for inclusion on the investment menu, was not a seller under this standard.  First of all, the Complaint does not allege that CitiStreet ever "urged" or "persuaded" plaintiffs to select the YPF.  The Plan Committee had to select a certain number of investment options in any case, and CitiStreet's role describing and recommending funds was advisory; it did not solicit the Plan Committee to make purchases it would not otherwise make.  Secondly, CitiStreet was not a solicitor seller because it did not have any direct contact with Plan participants.  Though CitiStreet had

annual contact with the Plan Committee, which selected the investment menu, only the Plan participants actually decided to purchase shares in any of the funds. Because CitiStreet did not directly solicit any of these purchases, it did not "offer or sell" securities within the meaning of § 410(a)(2). *See Shaw*, 82 F.3d at 1216 (dismissing claims where the complaint did not concretely allege that corporation directly solicited securities purchasers); *In re Westinghouse*, 90 F.3d at 717 n.19 (requiring a "direct relationship between the purchaser and the defendant"). Therefore, the § 410(a)(2) claim against CitiStreet is dismissed as well.

## CONCLUSION

For the foregoing reasons, State Street's motion to dismiss is granted in full. All claims against SSBT and SSgA are dismissed. CitiStreet's motion to dismiss is denied with respect to Count I (ERISA) but granted with respect to the state law claims (Counts II – VI).

SO ORDERED.

Dated: New York, New York
       **August 12**, 2010

Richard J. Holwell
United States District Judge